CLERK'S OFFICE U.S. DIST. COURT
AT BIG STONE GAP, VA
FILED

OCT 2 7 2008

JOHN F. CORCORAN, CLERK
BY: *[signature]*
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | |
|---|---|
| **GRACE EDNA STIDHAM,** ) | |
| Plaintiff, ) | Civil Action No. 2:08cv00021 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | By: GLEN M. WILLIAMS |
| **Commissioner of Social Security,** ) | SENIOR UNITED STATES DISTRICT JUDGE |
| Defendant. ) | |

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

### I. Background and Standard of Review

The plaintiff, Grace Edna Stidham, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Stidham's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

-1-

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Stidham filed her application for DIB on September 19, 2006, alleging disability as of November 16, 2005, due to panic and anxiety attacks, nervousness, pain in her legs and knees, headaches, menopausal symptoms, numbness in her hands and an attempted suicide. (Record, ("R."), at 52-56, 68.) The claim was denied initially and upon reconsideration. (R. at 31-37, 39-41.) Stidham then requested a hearing before an administrative law judge, ("ALJ"). (R. at 42.) The ALJ held a hearing on October 25, 2007, at which Stidham was represented by counsel. (R. at 291-316.)

By decision dated November 8, 2007, the ALJ denied Stidham's claim. (R. at 12-25.) The ALJ found that Stidham met the insured status requirements of the Act for DIB purposes through December 31, 2010. (R. at 17.) The ALJ also found that Stidham had not engaged in substantial gainful activity since the alleged onset date. (R. at 17.) The ALJ determined that the medical evidence established that Stidham suffered from severe impairments, namely depression, multiple aches and pains, borderline intellectual ability and probable alcohol abuse. (R. at 17.) However, the ALJ found that Stidham did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17.) The ALJ found that Stidham retained the residual functional capacity

-2-

to perform a limited range of light work,[1] noting that she was able to frequently lift and/or carry items weighing up to 10 pounds, occasionally lift and/or carry items weighing up to 20 pounds and sit, stand and/or walk for approximately six hours each in a typical eight-hour workday. (R. at 22.) The ALJ also determined that Stidham could occasionally bend, stoop, balance, crouch, crawl and kneel, but noted that she could not climb. (R. at 22.) The ALJ found no visual, communicative, manipulative or environmental limitations, but due to Stidham's moderate reduction in concentration from depression, the ALJ found that Stidham was limited to simple, non-complex tasks. (R. at 22.) Further, the ALJ determined that, due to Stidham's impaired social functioning, she could not work closely with co-workers and could not work with the public. (R. at 22.) The ALJ also found that Stidham was able to maintain concentration, persistence or pace for an eight-hour workday for simple, non-complex tasks and that she could work with normal supervision. (R. at 22.) Thus, the ALJ found that Stidham was unable to return to any of her past relevant work. (R. at 24.) The ALJ determined that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding of "not disabled" regardless of whether Stidham possessed transferable job skills. (R. at 24.) Based upon Stidham's age, education, work experience and residual functional capacity, the ALJ determined that there were other jobs existing in significant numbers within the national economy that Stidham could perform, including jobs as a housekeeper/hotel maid, a dry cleaner bagger and a laundry worker. (R. at 24-25.) Therefore, the ALJ concluded that Stidham was not under a disability as defined in the Act and that she was not entitled to benefits. (R.

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2008).

at 25.) *See* 20 C.F.R. § 404.1520(f) (2008).

After the ALJ issued her decision, Stidham pursued her administration appeals, (R. at 11), but the Appeals Council denied her request for review. (R. at 5-7.) Stidham then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2008). This case is before the court on Stidham's motion for summary judgment, which was filed on August 21, 2008, and the Commissioner's motion for summary judgment, which was filed on September 18, 2008.

## II. Facts

Stidham was born in 1960, (R. at 52, 86, 105), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). According to the record, Stidham has a high school education, (R. at 74), and past relevant work experience as a sales clerk in a retail store. (R. at 69.)

At the hearing before the ALJ on October 25, 2007, Stidham testified that she was employed as a sales clerk at Wal-Mart for fifteen years. (R. at 297.) She explained that she worked in the fabric and crafts department, which required her to stock shelves, wait on customers, measure and cut fabric and organize merchandise. (R. at 297.) Stidham further explained that she was forced to quit her job in 2005 because she was unable to perform her work. (R. at 298.) Stidham noted that she was not eligible for retirement benefits, but she did receive approximately $8,000.00 in profit sharing, which she said helped with her medical bills. (R. at 299.) However,

-4-

she testified that she had no insurance and that her savings was entirely depleted. (R. at 299.) Stidham stated that she and her husband relied on his Social Security benefits as their sole source of income. (R. at 299.)

Stidham testified that she enjoyed her job for the most part, but indicated that during her last couple of years her nerves "gave out" and she could no longer be around people and crowds. (R. at 299-300.) She attributed her condition to the fact that her husband had suffered a near fatal heart attack in 2002. (R. at 300.) Stidham explained that her husband's illness "broke [her] down a lot." (R. at 300.) She testified that, after her husband's heart attack, she was able to push herself and continue working, but she claimed that in 2005 she realized that she "just couldn't do it anymore." (R. at 300.) Stidham stated that her nerves prevented her from being around people, commenting that she developed a fear of people and that "everything in [her] life just changed." (R. at 300.) Stidham testified that she did not seek counseling or medical treatment prior to quitting work, noting that she was too depressed. (R. at 301.) She also explained that, prior to quitting, she avoided treatment and suffered because her insurance did not pay an adequate amount. (R. at 301.)

Stidham testified that, since quitting work, she has sought treatment for her nerve problems. (R. at 301.) She testified that she was prescribed Paxil following her attempted suicide in August 2006. (R. at 301.) Stidham stated that the reason for her suicide attempt was because she became overwhelmed with her situation, noting that she felt like a failure and also felt guilty because she could no longer work and earn a living. (R. at 301.) She acknowledged that she consumed a large amount of alcohol

-5-

and prescription drugs the night of her attempted suicide. (R. at 302.) Stidham testified that she did not drink much prior to quitting work, but explained that she thought drinking might help her feel better. (R. at 302.) However, she admitted that her condition worsened after she began drinking. (R. at 302.) Stidham noted that she was hospitalized following the suicide attempt and that she spent three days in intensive care. (R. at 303.)

Stidham explained that she began seeing a counselor after her suicide attempt. (R. at 304.) She testified that, at the time of the hearing, she was being treated once or twice a month by James Kegley at Frontier Health. (R. at 304.) She also testified that she sought treatment from a psychiatrist and her family doctor. (R. at 304-05.) Stidham stated that she had been prescribed Paxil, Rozerem and was advised to take Aleve and Tylenol for her pain. (R. at 305.) She explained that she planned to ask her treating physician to prescribe her a pain medication because of back and hand pain, headaches, leg and knee pain and menopausal symptoms. (R. at 305.) Stidham commented that she experienced difficulty getting up after bending down. (R. at 305.) She testified that, since her August 2006 suicide attempt, she occasionally drinks wine, explaining that she usually drinks approximately one bottle of wine per week. (R. at 306.)

Stidham acknowledged that she cooked when she was able to do so. (R. at 306.) She stated that she could prepare items in the microwave when she was not in pain. (R. at 306.) She also testified that she attempted to keep her house clean. (R. at 306.) Stidham claimed that she and her husband have to ask family members to perform their yard work because they are unable to do it. (R. at 307.) Stidham

-6-

testified that she was able to drive, noting that she tries to drive when there is not much traffic. (R. at 307.) She also testified that she has not attempted to find other work since she quit her job, noting that she was simply unable to work. (R. at 308.) Stidham stated that pain and depression prevented her from working. (R. at 308.)

Upon questioning by her counsel, Stidham stated that she experienced sadness and depression daily. (R. at 309.) She testified that she was unable to be around people, explaining that it caused panic and anxiety attacks, even when taking Paxil. (R. at 309.) Stidham further testified that she experienced about one panic/anxiety attack per week. (R. at 309.) In describing these attacks, she stated that they caused chest pain, increased blood pressure and skin redness, which usually forces her to lie down. (R. at 309.) She indicated that she was unable to handle stress and that she experienced sleep difficulties. (R. at 309-10.) Stidham testified that she no longer took part in things for fun and that she was unable to deal with people. (R. at 310.) She acknowledged that she goes to the grocery store once or twice a week, but that she has to go early, when not as many people are in the store. (R. at 310.) However, she explained that on certain days she simply cannot go. (R. at 310-11.)

James B. Williams, a vocational expert, also was present and testified at Stidham's hearing. (R. at 312-15.) Williams identified Stidham's past work as a sales clerk as semi-skilled, light work. (R. at 313.) The ALJ asked Williams to consider a hypothetical individual of Stidham's age, education and background, who was limited to light work. (R. at 313.) The ALJ stated that, due to a moderate reduction in concentration caused by depression, this individual would be limited to simple, non-complex tasks, and this individual would not be able to work with the

-7-

public and could not work closely or cooperatively with other employees, but other employees could be around in general. (R. at 313.) Furthermore, Williams was asked to assume that this individual could not climb, but could perform other occasional postural activities. (R. at 313.) Based upon the above-mentioned limitations, Williams was asked if Stidham could return to her past work. (R. at 313.) Williams explained that Stidham would not be able to perform her past work as a sales clerk because it would require interaction with customers and being around the public. (R. at 313.) Williams testified that there would be transferable skills to other sales jobs, but pointed out that all the other sales jobs would include interaction with the public. (R. at 313.) Williams explained that there would be jobs available in the unskilled, light work category for such an individual, including a housekeeper/maid, a dry cleaning bagger and a laundry worker. (R. at 314.) Williams indicated that his testimony was consistent with the Dictionary of Occupational Titles. (R. at 314.)

Stidham's counsel asked Williams to consider an individual who was seriously limited, but not precluded, in following work rules, relating to co-workers, dealing with the public and interacting with supervisors, with no useful ability to deal with work stresses, who was seriously limited in the ability to do simple job instructions and, due to these impairments, would miss in excess of two days per month of work. (R. at 314-15.) Williams was then asked if such an individual would be able to perform work on a sustained basis. (R. at 315.) Williams testified that such an individual would likely lose her employment due to the unexcused absences. (R. at 315.) Furthermore, he indicated that the hypothetical suggested that, if the frequency and duration of work would keep the individual from being productive and working the required hours, then the individual could not work. (R. at 315.)

-8-

In rendering her decision, the ALJ reviewed medical records from Norton Community Hospital; Mountain View Regional Medical Center; Dr. Rodolfo Cartagena, M.D.; Family Practice Specialist; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Michael Hartman, M.D., a state agency physician; Dr. Richard Surrusco, M.D., a state agency physician; E. Hugh Tenison, Ph.D., a state agency psychologist; Dr. Gaileo Molina, M.D.; Wise County Behavioral Health; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; and Wise County Health Department. Stidham's counsel presented additional evidence from Wise County Behavioral Health Services, dated December 13, 2007, to the Appeals Council.[2]

Stidham has not challenged any of the ALJ's findings with respect to her alleged physical impairments. Thus, the facts summarized will focus only on the medical records relevant to her alleged mental impairments. On August 11, 2006, Stidham was taken to Norton Community Hospital emergency room as the result of an attempted suicide. (R. at 132-44.) Upon examination, Stidham was lethargic, uncooperative, disoriented, slow to respond to commands, unable to answer questions and had a slurred speech. (R. at 132-33.) The medical records indicated that her complaints were severe and that she was depressed and stressed. (R. at 132-33.) It was concluded that Stidham had overdosed on alcohol and prescription drugs. (R. at 132-33.) The clinical impression noted that Stidham had overdosed and that she was depressed and suicidal. (R. at 133.)

---

[2]Since the Appeals Council considered this evidence in reaching its decision not to grant review, this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dept. of Health & Human Services.*, 953 F.2d 93, 96 (4th Cir. 1991).

Stidham was admitted to Mountain View Regional Medical Center following her suicide attempt, where she was treated primarily by Dr. Kenneth Kiser, M.D. (R. at 145-61.) Stidham indicated that she would never attempt suicide again. (R. at 145.) A review of systems noted intermittent depression with an anxiety and panic disorder. (R. at 146.) She explained that her depression and anxiety had been exacerbated by the death of her cat. (R. at 146.) Stidham admitted that, prior to the overdose, she did not want to live. (R. at 146.) Upon examination and release from the hospital on August 13, 2006, Stidham was alert and oriented and was not in acute distress. (R. at 145.) The medical assessment noted an overdose on Ambien and alcohol intoxication. (R. at 145.) It also was noted that a psychological evaluation was pending and that arrangements had been made for an appointment with Frontier Health. (R. at 145.)

Stidham was treated at Family Practice Specialists from August 11, 2006, to October 31, 2006.[3] (R. at 171-84.) On August 23, 2006, Stidham reported recurrent problems with depression, nervousness, panic/anxiety attacks, headaches, back pain and leg and knee pain. (R. at 175.) Although the medical record is difficult to read, it appears that Stidham noted that she was "feeling better" as of August 23, 2006. (R. at 180.)

Stidham presented to Dr. Rodolfo Cartagena, M.D., on August 24, 2006, for a gynecological examination at the referral of Dr. Kiser. (R. at 162-65.) Stidham explained that her suicide attempt was directly related to depression, noting that she had no one to turn to and that her problems had worsened due to the fact that she

[3]The medical records from this time period are largely illegible. (R. at 171-84.)

Case 2:08-cv-00021-GMW-PMS Document 14 Filed 10/27/08 Page 10 of 36 Pageid#: 76

could no longer work and because of her husband's recent heart attack. (R. at 162.) She reported that she could no longer work because of pain all over her body, which was exacerbated by standing and walking. (R. at 162.)

Stidham was treated by Dr. Gaileo Molina, M.D., on August 24, 2006, February 26, 2007, and August 24, 2007.[4] (R. at 212-13, 285-87.) Stidham reported chief complaints of aches, dizziness, nausea, backaches and back pain. (R. at 286.) She explained that she had experienced nervousness since 2002, when her husband became ill. (R. at 286.) Dr. Molina noted that Stidham described typical signs and symptoms of major depression and agoraphobia. (R. at 286.) Stidham indicated that she was unable to be around people, which forced her to quit work in November 2005. (R. at 286.) Although Stidham stated that her August 2006 attempted suicide occurred because she was overwhelmed, she stated that she realized that it was wrong and that she had no intentions of doing it again. (R. at 286.) Dr. Molina's assessment indicated, in relevant part, that Stidham suffered from major depression with agoraphobia, likely with an adjustment disorder. (R. at 287.) Stidham's Paxil prescription was refilled and she was advised to take Tylenol or Aleve for her pain. (R. at 287.)

On October 31, 2006, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), which indicated that Stidham suffered from a substance addiction disorder, but that the impairment was not severe. (R. at 185-97.) Specifically, Leizer found that Stidham exhibited behavioral changes or physical changes associated with the regular use of substances

---

[4]The treatment notes from these visits are largely illegible. (R. at 212-13, 285-87.)

that affect the central nervous system. (R. at 193.) Leizer noted no limitations as to Stidham's activities of daily living, in maintaining social functioning or in maintaining concentration, persistence or pace. (R. at 195.) In addition, Leizer reported no episodes of decompensation. (R. at 195.) Leizer found that Stidham's allegations were partially credible. (R. at 197.)

Stidham sought treatment at Wise County Behavioral Health, ("WCBH"), from December 5, 2006, to December 13, 2007. (R. at 214-51, 279-84, 290.) During these visits, Stidham was routinely treated by James Kegley, M.S. (R. at 214-51, 279-84, 290.) On December 5, 2006, an initial intake interview was conducted, at which time records were reviewed from Frontier Health related to Stidham's August 2006 overdose. (R. at 246-51.) The records, which were dated August 13, 2006, showed that Stidham had suffered from depression for several months prior to the suicide attempt, especially since the death of her pet. (R. at 250.) In addition, the records indicated that Stidham expressed remorse for her actions and verbally agreed to not attempt to harm herself in the future. (R. at 250.) She also agreed to undergo outpatient counseling. (R. at 250.) A crisis intervention/consultation revealed a diagnosis of a depressive disorder, not otherwise specified, and a Global Assessment of Functioning, ("GAF"), score of 35.[5] (R. at 249.) On November 10, 2006, Stidham was again treated at Frontier Health. (R. at 246-47.) Once again, Stidham was

---

[5]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 31-40 indicates that the individual has "[s]ome impairment in reality testing or communication . . . OR major impairments in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." DSM-IV at 32.

Case 2:08-cv-00021-GMW-PMS   Document 14   Filed 10/27/08   Page 12 of 36   Pageid#: 78

diagnosed with a depressive disorder, not otherwise specified. (R. at 247.) However, her GAF score improved to 45.[6] (R. at 247.)

The intake admission form noted that Stidham presented with depression, anxiety and panic attacks, and that nerve problems forced her to quit her job at Wal-Mart. (R. at 224.) Stidham reported that she did not like being around other people and it was noted that she had many life stressors, including her husband's poor health. (R. at 224.) She also reported sadness, insomnia, irritability and tearfulness. (R. at 224.) Her presenting problems were noted as depression or a mood disorder. (R. at 224.) At the time of the intake, Stidham indicated that she had not received any prior psychiatric treatment and it was noted that she had no history of substance abuse. (R. at 225.) Stidham's symptom checklist indicated a moderate decrease in energy/fatigue, as well as moderate anxiety, panic attacks, avoidance behavior, worrying, distractibility, poor attention/concentration, depressed mood, apathy, feeling worthless, helplessness, irritability, loss of interest/pleasure, low self-esteem, tearfulness and insomnia. (R. at 233-35.) It also was noted that Stidham had past suicidal ideations. (R. at 234.) A DSM-IV Assessment was conducted on December 5, 2006, and indicated a possible diagnosis of panic disorder with agoraphobia and a major depressive disorder. (R. at 219.) Stidham reported that she was unable to work and that she had no health insurance. (R. at 219.) Stidham's then-current GAF was 50. (R. at 219.) Stidham's strengths were noted as average intelligence or above, self-initiated treatment, insight into her problem, open disclosure and sociable, and her weaknesses were limited financial resources and inadequate leisure and

_____

[6]A GAF of 41-50 indicates that the individual has "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning . . . ." DSM-IV at 32.

-13-

recreation. (R. at 219-20.) It was concluded that it was medically necessary for Stidham to undergo individual and group psychotherapy. (R. at 239.)

On December 18, 2006, Stidham presented to Kegley and reported pain in her legs, hands, knees and back, and also reported a troubled childhood caused by fear of an abusive step-father. (R. at 218.) She explained that she also sometimes "bottom[ed] out" when thinking of her husband's medical condition and that she felt like a "loser" because she was no longer able to work. (R. at 218.) Stidham indicated that she could no longer "handle things well." (R. at 218.) Kegley noted that Stidham showed no signs of suicidal or homicidal ideations, and he reported that she presented with moderate depression and a congruent affect. (R. at 218.) Kegley encouraged Stidham to participate in appropriate diversion/leisure activities. (R. at 218.) Stidham returned to WCBH on January 3, 2007, and explained that she had experienced a bad year due to constant pain and her husband's declining health. (R. at 217.) No suicidal or homicidal ideations were observed and Stidham appeared to be mildly depressed with a congruent affect. (R. at 217.) Further individual therapy was recommended due to Stidham's admitted lack of self-esteem. (R. at 217.) Stidham also presented on January 16, February 20, February 27 and March 6, 2007, with similar complaints of pain and continued emotional problems. (R. at 214-16, 282.) During these visits, her mood and affect were appropriate and no suicidal or homicidal ideations were observed. (R. at 214-16, 282.) She reported that she did not feel productive due to her inability to work, reported financial difficulty and indicated that she could not be around crowds. (R. at 215-16, 282.) Stidham participated in group discussions and viewed material relating to anger, depression, anxiety, worry, grief and guilt. (R. at 214-16.)

Stidham presented to WCBH on March 27, 2007, and noted that her condition, as well as her husband's poor physical condition, had contributed to their financial difficulties. (R. at 281.) She admitted that her mental/memory impairments had increased, but noted that she was no longer suicidal. (R. at 281.) Stidham's mood and affect were appropriate and there was no indication of suicidal or homicidal ideations. (R. at 281.) Stidham reported shame as a result of her inability to work, noting that it also had a negative impact on her self-esteem and self-image. (R. at 281.) Stidham reported feelings of worthlessness and again stated that she felt like a "loser." (R. at 281.) On April 20, 2007, Stidham reported continued depression and anxiousness, indicating that she had suffered from frequent panic attacks since her last treatment session. (R. at 280.) During this visit, there was no indication of suicidal or homicidal ideations, but Stidham appeared to be mildly depressed. (R. at 280.) On August 21, 2007, Stidham's evaluation remained relatively the same, as she presented with a moderately depressed mood with a congruent affect. (R. at 279.) There were no indications of suicidal or homicidal ideations. (R. at 279.) A diagnostic impression indicated a diagnosis of panic disorder with agoraphobia and a major depressive disorder. (R. at 279.)

On September 28, 2007, Stidham presented to WCBH and explained that she was not doing well due to back pain, leg pain and headaches. (R. at 284.) Stidham reported continued panic attacks and stated that she avoided people. (R. at 284.) She further reported that she could no longer work because her "nerves [were] just shot." (R. at 284.) Stidham was observed to be moderately depressed with a congruent affect. (R. at 284.) There was no evidence of suicidal or homicidal ideations. (R. at 284.) On October 11, 2007, Stidham informed Kegley that she continued to

-15-

experience panic attacks, as well as knee and leg pain, swelling and numbness in her hands. (R. at 283.) She commented that she was limited as to which household chores she could perform. (R. at 283.) Stidham discussed her continued financial dilemma and expressed concern. (R. at 283.) She reiterated that she would not attempt to harm herself again, as there was no indication of suicidal or homicidal ideations. (R. at 283.) Her mood ranged from mildly to moderately depressed with a congruent affect. (R. at 283.) On December 13, 2007, Stidham explained that her disability application had been denied, which she claimed was a "big set back," resulting in continued depression and anxiety. (R. at 290.) Among other complaints, Stidham stated that she could not function in a work setting because she was unable to be around people. (R. at 290.) There was no indication of suicidal or homicidal ideations. (R. at 290.) Stidham's mood was moderately depressed with a congruent affect. (R. at 290.) Stidham noted that she was unable to drive herself to the appointment because she was too nervous. (R. at 290.) Kegley reported that Stidham's visualization of a positive future remained impossible. (R. at 290.)

On February 12, 2007, E. Hugh Tenison, Ph.D., a state agency psychologist, completed a PRTF. (R. at 199-211.) Tenison found that Stidham suffered from a substance addiction disorder, but found that the impairment was not severe. (R. at 199.) According to Tenison, Stidham showed behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system. (R. at 207.) However, Tenison determined that Stidham's overdose was an impairment that did not precisely satisfy the required diagnostic criteria. (R. at 207.) Tenison noted no restrictions as to Stidham's activities of daily living, but found Stidham to be mildly limited in maintaining social functioning and maintaining

-16-

concentration, persistence or pace. (R. at 209.) No episodes of decompensation were noted. (R. at 209.) Tenison found that Stidham's allegations were partially credible and opined that the medical evidence did not confirm the presence of severe symptoms. (R. at 211.)

On March 13, 2007, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, conducted a consultative psychological report at the request of Stidham's counsel. (R. at 252-64.) Stidham reported a history of psychological difficulties, including her August 2006 attempted suicide. (R. at 252.) In addition, she reported chronic generalized anxiety, panic attacks and depression. (R. at 252.) Lanthorn conducted the Wechsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), intelligence quotient, ("IQ"), test, which revealed a verbal IQ of 79, a performance IQ of 75 and a full scale IQ of 74. (R. at 253.) There was a clinically significant difference between her verbal IQ and her performance IQ, suggesting the presence of an unusually elevated degree of anxiety, tension and depression. (R. at 256.) Stidham's verbal comprehensive index was 82 and her perceptual organization index was 74. (R. at 253.) Stidham's relative strengths were identified in the following areas: range of vocabulary, abstract and logical thinking abilities and practical judgment common sense reasoning. (R. at 257.) She was found to be in the borderline range in the following areas: performing non-written arithmetical calculations, rote and immediate memory functions, fund of general information gained from education and experience, visual alertness to essential detail in the environment, visual-motor coordination skills, pattern completion and spatial reasoning and social competence. (R. at 257.) In the areas of psychomotor speed and manual dexterity, Stidham was found to be in the extremely low range. (R. at 257.)

-17-

Lanthorn explained that when this particular subtest is significantly below the previously mentioned subtests, it is often an indicator of the presence of depression, anxiety and feelings of frustration and tension. (R. at 257.)

Lanthorn also conducted the Minnesota Multiphasic Personality Inventory Second Edition, ("MMPI-2"). (R. at 257-58.) Because of several inconsistencies noted in the evaluation, Lanthorn explained that he was forced to proceed in a very cautious manner. (R. at 258.) Lanthorn noted that Stidham's clinical scales showed the clear presence of extreme depression, unhappiness and pessimism about the future. (R. at 258.) He further noted that she was likely to frequently feel guilt and to be self-critical. (R. at 258.) Lanthorn cautioned that suicidal ideation and potential needed to be evaluated carefully by both the medical and mental professionals who were managing her care. (R. at 258.) He observed that Stidham felt helpless, inadequate and that she lacked self-confidence. (R. at 258.) He also reported that Stidham's depression appeared to be contributing to her sleep and appetite functions, as well as her lower frustration tolerance and social withdrawal. (R. at 258.) Her test results indicated the presence of a high degree of anxiety, tension, worry and emotional discomfort. (R. at 259.) Lanthorn determined that Stidham was likely to be lethargic, listless and apathetic. (R. at 259.) Moreover, he found that she also would likely develop physical symptoms as a result of her stress. (R. at 259.) She appeared to be psychologically naive, immature, self-absorbed and she lacked insight concerning the causes of her symptoms. (R. at 259.) Lanthorn noted that she was very likely to have suicidal ideations and that she was prone to substance abuse. (R. at 259.)

-18-

Lanthorn determined that Stidham's test results showed that she experienced moderate to severe levels of emotional distress, characterized by depression, dysphoria, chronic worry, agitation, anxiety and guilt. (R. at 259.) He also found that she appeared to have lost her desire to work out her problems. (R. at 259.) Lanthorn stated that Stidham's tests results also showed difficulties in concentration as well as memory problems. (R. at 259.) He noted that decision-making was very difficult for Stidham, indicating that important decisions may border on "nearly impossible." (R. at 260.) Lanthorn further reported that the test results revealed that she was introverted, withdrawn and that she kept others at a distance. (R. at 260.) Based upon the results of the MMPI-2, Lanthorn noted that Stidham's prognosis was very poor and that her problems were chronic. (R. at 260.)

Lanthorn diagnosed Stidham with a major depressive disorder, recurrent and severe, a panic disorder without agoraphobia, a generalized anxiety disorder, alcohol abuse, borderline intellectual functioning, economic problems, problems with access to health care and a then-current GAF 50-55.[7] (R. at 260-61.) Lanthorn determined that Stidham was competent as to the management of her own funds and found that her prognosis was between guarded and poor. (R. at 261.) Lanthorn "strongly encouraged" Stidham to seek the services of her local mental health center for psychiatric and psychotherapeutic intervention. (R. at 261.) He also opined that she did not appear to be responding well to her anti-depressant medication. (R. at 261.) Lanthorn indicated that Stidham's psychopathology left her very over-reactive to stressors. (R. at 261.) He further reported that she struggled with almost all the signs

---

[7]A GAF of 51-60 indicates that the individual has "[m]oderate symptoms . . . OR moderate difficulty in social, occupation, or school functioning . . . ." DSM-IV at 32.

-19-

of severe clinical depression and that she experienced frequent panic attacks. (R. at 261.) Lanthorn concluded that Stidham's psychological problems had caused short-term memory loss, fatigue, enervation, anhedonia, dysphoria, lack of a sex drive, continued suicidal ideation, difficulties making judgment, diminished self-esteem, lack of self-confidence and social withdrawal. (R. at 261.)

Lanthorn also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental), on February 13, 2007. (R. at 262-64.) Lanthorn determined that Stidham had a fair ability to follow work rules and function independently. (R. at 262.) He also found that Stidham had a poor/none to fair ability to maintain attention and concentration, and a poor/none ability to relate to co-workers, deal with the public, use judgment with the public, interact with supervisors, and deal with work stresses. (R. at 262.) Furthermore, Lanthorn found that Stidham had a poor/no ability to understand, remember and carry out complex job instructions, a fair ability to understand, remember and carry out detailed, but not complex, job instructions and a good ability to understand, remember and carry out simple job instructions. (R. at 263.) Lanthorn found that Stidham possessed a poor/no ability to behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. (R. at 263.) He determined that she had a fair ability to maintain personal appearance. (R. at 263.) Lanthorn noted that Stidham was capable of managing her benefits in her best interest. (R. at 264.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20

C.F.R. § 404.1520 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520 (2008). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2008).

Under this analysis, a claimant has the initial burden of showing that she is unable able to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated November 8, 2007, the ALJ denied Stidham's claim. (R. at 12-25.) The ALJ found that Stidham met the insured status requirements of the Act for DIB purposes through December 31, 2010. (R. at 17.) The ALJ also found that Stidham had not engaged in substantial gainful activity since the alleged onset date. (R. at 17.) The ALJ determined that the medical evidence established that Stidham suffered from severe impairments, namely depression, multiple aches and pains,

Case 2:08-cv-00021-GMW-PMS   Document 14   Filed 10/27/08   Page 21 of 36   Pageid#: 87

borderline intellectual ability and probable alcohol abuse. (R. at 17.) However, the ALJ found that Stidham did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17.) The ALJ found that Stidham retained the residual functional capacity to perform a limited range of light work, noting that she was able to frequently lift and/or carry items weighing up to 10 pounds, occasionally lift and/or carry items weighing up to 20 pounds and sit, stand and/or walk for approximately six hours each in a typical eight-hour workday. (R. at 22.) The ALJ also determined that Stidham could occasionally bend, stoop, balance, crouch, crawl and kneel, but noted that she could not climb. (R. at 22.) The ALJ found no visual, communicative, manipulative or environmental limitations, but due to Stidham's moderate reduction in concentration from depression, the ALJ found that Stidham was limited to simple, non-complex tasks. (R. at 22.) Further, the ALJ determined that, due to Stidham's impaired social functioning, she could not work closely with co-workers and could not work with the public. (R. at 22.) The ALJ also found that Stidham was able to maintain concentration, persistence or pace for an eight-hour workday for simple, non-complex tasks and that she could work with normal supervision. (R. at 22.) Thus, the ALJ found that Stidham was unable to return to any of her past relevant work. (R. at 24.) The ALJ determined that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding of "not disabled" regardless of whether Stidham possessed transferable job skills. (R. at 24.) Based upon Stidham's age, education, work experience and residual functional capacity, the ALJ determined that there were other jobs existing in significant numbers within the national economy that Stidham could perform, including jobs as a housekeeper/hotel maid, a dry cleaner bagger and a

-22-

laundry worker. (R. at 24-25.) Therefore, the ALJ concluded that Stidham was not under a disability as defined in the Act and that she was not entitled to benefits. (R. at 25.) *See* 20 C.F.R. § 404.1520(f) (2008).

Stidham argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 5-8.) Stidham also argues that the ALJ erred by failing to give full consideration to Lanthorn's findings as to the severity of Stidham's mental impairments and the resulting affects on her ability to work. (Plaintiff's Brief at 8-10.)

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the

-23-

wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

Stidham first argues that the ALJ failed to properly determine her residual functional capacity. (Plaintiff's Brief at 5-8.) Specifically, Stidham contends that the ALJ's residual functional capacity finding as to Stidham's mental limitations is not supported by substantial evidence within the record. (Plaintiff's Brief at 5-8.) Stidham claims that the ALJ's finding is in direct conflict with the substantial evidence of record, as the opinions by Dr. Molina, WCBH and Lanthorn indicate that Stidham is unable to perform substantial gainful activity at any level of exertion. (Plaintiff's Brief at 7-8.) This argument is without merit.

The ALJ determined that Stidham retained the residual functional capacity to perform a limited range of light work. (R. at 22.) In addition to imposing certain physical limitations on Stidham's ability to work, the ALJ also made specific findings relating to Stidham's mental limitations. (R. at 22.) Based on Stidham's moderate reduction in concentration as a result of depression, the ALJ found that Stidham was limited to simple, non-complex tasks. (R. at 22.) Additionally, the ALJ found that, due to Stidham's impaired social functioning, she would be unable to work with the public or to work closely with co-workers. (R. at 22.) The ALJ determined that Stidham was able to maintain concentration, persistence or pace for an eight-hour workday for simple, non-complex tasks and that she could work with normal supervision. (R. at 22.) I am of the opinion that this residual functional capacity

-24-

determination is supported by substantial evidence.

The record shows that subsequent to Stidham's attempted suicide and overdose in August 2006, she routinely reported complaints of depression, anxiety, panic attacks and nervousness. Stidham was admitted to Mountain View Medical Center following her overdose, at which time she indicated that she would never attempt suicide again. (R. at 146.) Upon her release, she was alert and oriented and in no acute distress. (R. at 145.) Stidham also was treated at Family Practice Specialists, where she reported recurrent problems with, among other things, depression, nervousness and panic/anxiety attacks. (R. at 175.) However, on August 23, 2006, Stidham acknowledged some improvement and reported that she was "feeling better." (R. at 180.)

Stidham also sought treatment from Dr. Molina on August 24, 2006, February 26, 2007, and August 24, 2007. (R. at 212-13, 285-87.) During these visits, Stidham claimed that she had experienced nervousness since 2002, when her husband became ill. (R. at 286.) Stidham also reported that she was unable to be around people and attributed her suicide attempt to the fact that she became overwhelmed. (R. at 286.) Nonetheless, the record shows that Stidham realized that her attempted suicide was wrong and she plainly stated that she had no intention of doing such a thing again. (R. at 286.) Dr. Molina noted that Stidham described typical signs and symptoms of major depression and agoraphobia. (R. at 286.) Thus, Dr. Molina's assessment indicated that Stidham suffered from major depression with agoraphobia, likely with an adjustment disorder. (R. at 286-87.) As such, Dr. Molina prescribed Paxil. (R. at 287.)

-25-

Stidham received treatment and attended counseling at WCBH from December 5, 2006, to December 13, 2007. (R. at 214-51, 279-84, 290.) At the time of the ALJ hearing, Stidham testified that she attended counseling/treatment once or twice a month. (R. at 304.) The treatment records from WCBH included a portion of records dating back to the time of Stidham's attempted suicide. (R. at 246-51.) In particular, the treatment records included a crisis intervention/consultation dated August 13, 2006, that revealed a diagnosis of a depressive disorder, not otherwise specified, and a GAF score of 35. (R. at 249) However, the treatment records dated November 10, 2006, show that while her diagnosis of a depressive disorder remained unchanged, her GAF score improved to 45. (R. at 247.)

The WCBH initial intake admission form dated December 5, 2006, showed that Stidham presented with complaints of depression, anxiety and panic attacks, and that her nerve problems caused her to quit her job. (R. at 224.) Stidham also reported that she did not like being around other people and it was noted that she had many life stressors. (R. at 224.) Furthermore, Stidham reported sadness, insomnia, irritability and tearfulness, and her presenting problems were noted as depression or a mood disorder. (R. at 224.) A symptom checklist indicated a moderate decrease in energy/fatigue, as well as moderate anxiety, panic attacks, avoidance behavior, worrying, distractibility, poor attention/concentration, depressed mood, apathy, feeling worthless, helplessness, irritability, loss of interest/pleasure, low self-esteem, tearfulness and insomnia. (R. at 233-35.) An assessment revealed a possible diagnosis of panic disorder with agoraphobia and a major depressive disorder. (R. at 219.) However, notably, Stidham's GAF score again improved, and as of December 2006 her GAF score was 50. (R. at 219.) It was concluded that it was

-26-

medically necessary for Stidham to undergo individual and group psychotherapy. (R. at 239.)

During the course of treatment at WCBH, from December 18, 2006, to December 13, 2007, the treatment records largely consist of subjective complaints, such as feelings of worthlessness, shame, emotional problems, inability to be around crowds, mental/memory impairments, lack of self-esteem, diminished self-image, continued depression and anxiousness, panic attacks and nervousness. (R. at 214-18, 279-81, 283-84, 290.) Despite these complaints and alleged symptoms, Kegley, a counselor at WCBH, never noted any signs of suicidal or homicidal ideations, (R. at 214-51, 279-84, 290), as Stidham specifically stated that she would not attempt to harm herself again. (R. at 283.) Further, the treatment notes show that Kegley never observed Stidham's mood to be anything more than mildly or moderately depressed. (R. at 214-51, 279-84, 290.) On several occasions, Stidham's mood and affect were observed to be appropriate. (R. at 214-16, 281-82.) On August 21, 2007, a diagnostic impression by Kegley indicated a diagnosis of panic disorder with agoraphobia and a major depressive disorder. (R. at 279.)

In the ALJ's opinion, she plainly stated that she accorded great weight to the opinions of the state agency psychologists. (R. at 24.) On October 31, 2006, Leizer completed a PRTF, which indicated that Stidham suffered from a substance addiction disorder, but that the impairment was not severe. (R. at 185-97.) Specifically, Leizer found that Stidham exhibited behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system. (R. at 193.) Leizer noted no limitations as to Stidham's activities of daily living, in maintaining

social functioning or in maintaining concentration, persistence or pace. (R. at 195.) In addition, Leizer reported no episodes of decompensation. (R. at 195.) Leizer found that Stidham's allegations were partially credible. (R. at 197.)

Similarly, on February 12, 2007, Tenison completed a PRTF. (R. at 199-211.) Tenison found that Stidham suffered from a substance addiction disorder, but found that the impairment was not severe. (R. at 199.) According to Tenison, Stidham showed behavioral or physical changes associated with the regular use of substances that affect the central nervous system. (R. at 207.) However, Tenison determined that Stidham's overdose was an impairment that did not precisely satisfy the required diagnostic criteria. (R. at 207.) Tenison noted no restrictions as to Stidham's activities of daily living, but found Stidham to be mildly limited in maintaining social functioning and maintaining concentration, persistence or pace. (R. at 209.) No episodes of decompensation were noted. (R. at 209.) Tenison found that Stidham's allegations were partially credible and opined that the medical evidence did not confirm the presence of severe symptoms. (R. at 211.)

The court recognizes that the opinions of licensed clinical psychologist Lanthorn, which will be fully discussed below, contain several restrictive limitations which are in conflict with the opinions of the state agency physicians and include more limitations than those noted in the remaining evidence of record. However, it is the court's duty to determine if substantial evidence exists in the record to support the ALJ's findings. In making that determination, the court is not permitted to weigh the evidence, nor does this court have the authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See*

-28-

*Hays*, 907 F.2d at 1456.

In this case, the ALJ's residual functional capacity with respect to Stidham's mental limitations is supported by the findings of the state agency psychologists. In addition, the record shows that, during the course of Stidham's treatment following her attempted suicide, her GAF score consistently improved. Furthermore, the treating physicians' notes mainly consist of subjective complaints and contain little, if any, insight as to how Stidham's mental limitations would impact her ability to perform work. It also should be noted that the court is of the opinion that the diagnoses included in the record were properly accounted for in the ALJ's residual functional capacity determination. In particular, the ALJ found that Stidham was limited to less than the full range of light work, including simple, non-complex tasks that her prohibited her from working with the public and working closely with co-workers. (R. at 22.) Lastly, the court notes that although the ALJ specifically stated that she accorded great weight to the opinions of the state agency psychologists, she nonetheless gave Stidham the benefit of the doubt by placing more restrictive limitations upon Stidham than those included in the state agency psychologists' findings.

Accordingly, after a thorough review of the relevant evidence, the undersigned is of the opinion that there is substantial evidence within the record to support the ALJ's residual functional capacity finding as it relates to Stidham's mental limitations.

Next, Stidham contends that the ALJ erred by failing to give full consideration

to the findings of Lanthorn as to the severity of Stidham's mental impairments and how the impairments would impact her ability to work. (Plaintiff's Brief at 8-10.) In particular, Stidham argues the evidence of record shows that she is unable to perform substantial gainful activity at any level of exertion. (Plaintiff's Brief at 10.) Stidham contends that Lanthorn's restrictive findings are supported by the findings by Dr. Molina and WCBH and that the ALJ should have accorded full consideration to Lanthorn's opinion. (Plaintiff's Brief at 8-10.) Stidham argues that the ALJ does not possess the requisite competency to substitute her views on the severity of Stidham's psychiatric impairments for those of a trained professional. (Plaintiff's Brief at 8.)

On March 13, 2007, Lanthorn conducted a consultative psychological report at the request of Stidham's counsel. (R. at 252-64.) Lanthorn conducted the WAIS-III test, which revealed a verbal IQ of 79, a performance IQ of 75 and a full scale IQ of 74. (R. at 253.) There was a clinically significant difference between Stidham's verbal IQ and her performance IQ, suggesting the presence of an unusually elevated degree of anxiety, tension and depression. (R. at 256.) Stidham's verbal comprehensive index was 82 and her perceptual organization index was 74. (R. at 253.) Stidham's relative strengths were identified in the following areas: range of vocabulary, abstract and logical thinking abilities and practical judgment/common sense reasoning. (R. at 257.) She was found to be in the borderline range in the following areas: performing non-written arithmetical calculations, rote and immediate memory functions, fund of general information gained from education and experience, visual alertness to essential detail in the environment, visual-motor coordination skills, pattern completion and spatial reasoning and social competence.

-30-

(R. at 257.) In the areas of psychomotor speed and manual dexterity, Stidham was found to be in the extremely low range. (R. at 257.) Lanthorn explained that when this particular subtest is significantly below the previously mentioned subtests, it is often an indicator of the presence of depression, anxiety and feelings of frustration and tension. (R. at 257.)

Lanthorn also conducted the MMPI-2 and, because of several inconsistencies noted in the evaluation, Lanthorn explained that he was forced to proceed in a very cautious manner. (R. at 258.) Lanthorn noted that Stidham's clinical scales showed the clear presence of extreme depression, unhappiness and pessimism about the future. (R. at 258.) He further noted that she was likely to frequently feel guilt and to be self-critical. (R. at 258.) Lanthorn cautioned that suicidal ideation and potential needed to be evaluated carefully by both the medical and mental professionals who were managing her care. (R. at 258.) He observed that Stidham felt helpless, inadequate and that she lacked self-confidence. (R. at 258.) He also reported that Stidham's depression appeared to be contributing to her sleep and appetite functions, as well as her lower frustration tolerance and social withdrawal. (R. at 258.) Her test results indicated the presence of a high degree of anxiety, tension, worry and emotional discomfort. (R. at 259.) Lanthorn determined that Stidham was likely to be lethargic, listless and apathetic. (R. at 259.) Moreover, he found that she also would likely develop physical symptoms as a result of her stress. (R. at 259.) She appeared to be psychologically naive, immature, self-absorbed and she lacked insight concerning the causes of her symptoms. (R. at 259.) Lanthorn noted that she was very likely to have suicidal ideations and that she was prone to substance abuse. (R. at 259.)

-31-

Lanthorn determined that Stidham's test results showed that she experienced moderate to severe levels of emotional distress, characterized by depression, dysphoria, chronic worry, agitation, anxiety and guilt. (R. at 259.) He also found that she appeared to have lost her desire to work out her problems. (R. at 259.) Lanthorn stated that Stidham's tests results also showed difficulties in concentration as well as memory problems. (R. at 259.) He noted that decision-making was very difficult for Stidham, indicating that important decisions may border on "nearly impossible." (R. at 260.) Lanthorn further reported that the test results revealed that she was introverted, withdrawn and that she kept others at a distance. (R. at 260.) Based upon the results of the MMPI-2, Lanthorn noted that Stidham's prognosis was very poor and that her problems were chronic. (R. at 260.)

Lanthorn diagnosed Stidham with a major depressive disorder, recurrent and severe, a panic disorder without agoraphobia, a generalized anxiety disorder, alcohol abuse, borderline intellectual functioning, economic problems, problems with access to health care and a then-current GAF score of 50-55. (R. at 260-61.) Lanthorn determined that Stidham was competent as to the management of her own funds and found that her prognosis was between guarded and poor. (R. at 261.) Lanthorn "strongly encouraged" Stidham to seek the services of her local mental health center for psychiatric and psychotherapeutic intervention. (R. at 261.) He also opined that she did not appear to be responding well to her anti-depressant medication. (R. at 261.) Lanthorn indicated that Stidham's psychopathology left her very over-reactive to stressors. (R. at 261.) He further reported that she struggled with almost all the signs of severe clinical depression and that she experienced frequent panic attacks. (R. at 261.) Lanthorn concluded that Stidham's psychological problems had caused

short-term memory loss, fatigue, enervation, anhedonia, dysphoria, lack of a sex drive, continued suicidal ideation, difficulties making judgment, diminished self-esteem, lack of self-confidence and social withdrawal. (R. at 261.)

Lanthorn also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental), on February 13, 2007. (R. at 262-64.) Lanthorn determined that Stidham had a fair ability to follow work rules and function independently. (R. at 262.) He also found that Stidham had a poor/none to fair ability to maintain attention and concentration, and a poor/none ability to relate to co-workers, deal with the public, use judgment with the public, interact with supervisors, and deal with work stresses. (R. at 262.) Furthermore, Lanthorn found that Stidham had a poor/no ability to understand, remember and carry out complex job instructions, a fair ability to understand, remember and carry out detailed, but not complex, job instructions and a good ability to understand, remember and carry out simple job instructions. (R. at 263.) Lanthorn found that Stidham possessed a poor/no ability to behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. (R. at 263.) He determined that she had a fair ability to maintain personal appearance. (R. at 263.) Lanthorn noted that Stidham was capable of managing her benefits in her best interest. (R. at 264.)

In the ALJ's opinion, she specifically rejected Lanthorn's findings, noting that they were inconsistent with the progress notes from treating sources, the claimant's activities of daily living and the record as a whole. (R. at 22.) After reviewing the relevant evidence of record, I agree. First, I note that the ALJ was under no obligation to accord great weight to the opinion of Lanthorn. In this case, Lanthorn

-33-

simply examined Stidham on one occasion, providing a consultative examination at the request of Stidham's counsel. Lanthorn's single examination does not qualify him as a treating source, as his services were requested solely to provide a report in support of Stidham's DIB claim. *See* 20 C.F.R. § 404.1502. A non-treating source's opinion should be discounted and does not constitute substantial evidence when it is contradicted by other evidence within the record. *See Kyle v. Cohen*, 449 F.2d 489 (4th Cir. 1971).

As discussed above, the evidence of record from Stidham's treating sources consisted mostly of subjective complaints containing no specific information or opinions on Stidham's ability to work. Moreover, the records from WCBH indicate that Stidham's GAF score steadily improved and that she often presented with an appropriate mood and affect. During the course of her treatment at WCBH, there were no indications of suicidal or homicidal ideations, clearly showing that Stidham's mental state and will to live had drastically improved since her August 2006 overdose. It should also be noted that, other than attending counseling sessions, Stidham's only other form of treatment was a prescription for Paxil. There is no evidence demonstrating that Stidham ever sought or needed more intensive treatment. Additionally, Stidham has not been hospitalized for any psychiatric problems since her attempted suicide in August 2006.

The state agency psychologists both opined that Stidham did not suffer from a severe impairment. (R. at 185-87, 199-211.) Neither Leizer nor Tenison found that Stidham was limited in her activities of daily living. (R. at 195, 209.) While Leizer also noted no limitations as to Stidham's ability to maintain social functioning,

-34-

concentration, persistence or pace, Tenison only noted mild limitations in those areas. (R. at 195, 209.) The state agency psychologists noted no episodes of decompensation and each determined that Stidham's allegations were only partially credible. (R. at 197, 211.) Furthermore, as noted by the ALJ, Stidham's admitted activities of daily living were inconsistent with Lanthorn's restrictions and Stidham's allegations of disability. At the hearing, Stidham testified that she prepared meals, cleaned her house, shopped for groceries once or twice a week and that she was able to drive. (R. at 306-07, 310.) The record also shows that Stidham acknowledged that she was able to perform tasks such as caring for her ailing husband and her pets, preparing meals, performing light-duty chores and maintaining financial responsibilities and records. (R. at 76, 95-102, 125-27.)

The court also notes that, based upon the medical evidence, the ALJ's residual functional capacity accounted for Stidham's mental limitations. As mentioned above, the ALJ determined that, due to Stidham's depression and impaired social functioning, she was restricted to a limited range of light work, consisting of simple, non-complex tasks that would not require Stidham to work closely with co-workers or to work with the public. (R. at 22.) Further, the vocational expert, in considering a hypothetical based upon the above-mentioned limitations, testified that there were jobs in the unskilled, light category available within the national economy that such an individual could perform, such as a housekeeper/maid, a dry cleaning bagger and a laundry worker. (R. at 314.) Notably, he explained that the jobs identified would not require Stidham to interact closely with co-workers or the general public. (R. at 313-14.)

Based upon my review of the record, I am of the opinion that the ALJ properly rejected the opinion of Lanthorn, as it was inconsistent with other objective medical evidence within the record. Moreover, the court reiterates that the ALJ's residual functional capacity determination is supported by substantial evidence.

## IV. Conclusion

For the foregoing reasons, I will sustain the Commissioner's motion for summary judgment and overrule Stidham's motion for summary judgment. The Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED:     This _27ᵗʰ_ day of October 2008.


_____

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE